IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 17, 2015 Session


TONY FULTON WELLS v. STATE OF TENNESSEE


Appeal from the Criminal Court for Union County
No. 4252     E. Shayne Sexton, Judge

_____


No. E2015-00463-CCA-R3-PC – Filed February 17, 2016
_____


The petitioner, Tony Fulton Wells, was initially charged with first degree (premeditated) murder, and he later pled guilty to second degree murder, a Class A felony. He filed a petition for post-conviction relief, which was denied. On appeal, he argues that his guilty plea was not knowing and voluntary because it was coerced. He also argues that he received the ineffective assistance of counsel because trial counsel failed to have a hearing to suppress his written confessions; failed to obtain more time for him to consider the plea agreement; failed to interview the petitioner's neighbor; failed to investigate the crime scene; and failed to explain adequately the law or to listen to the petitioner. Following our review of the record, the briefs of the parties, and the applicable law, we affirm the judgment of the post-conviction court.


Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brandon T. Kibert, Tazewell, Tennessee, for the Appellant, Tony Fulton Wells.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Jared Effler, District Attorney General; and Tyler Hurst, Assistant District Attorney General, for the Appellee, State of Tennessee.


OPINION

## FACTS AND PROCEDURAL HISTORY

At the petitioner's April 2, 2012 guilty plea hearing, the trial court engaged in a colloquy with the petitioner. The petitioner testified that he signed his guilty plea form after it was read to him and that he understood the terms of the form. He stated that no one had forced or threatened him to plead guilty or made any promises to induce his guilty plea. He agreed that he was pleading guilty of his own free will. The petitioner stated that he had no complaints about the work of trial counsel. He agreed that he was satisfied with trial counsel's representation and that trial counsel satisfactorily investigated and prepared for the case.

The State then introduced statements from the victim's two sons, the victim's neighbor Linda Griffey, and two statements the petitioner made to police as a summary of the evidence against the petitioner. According to the statements, the petitioner lived with the victim and her two sons, D.C. and T.W., and he was the boys' stepfather. Prior to the shooting, the petitioner had been unemployed for several weeks and was "stressed" about his inability to find a job. The petitioner had a Ruger P 89 pistol that he showed the victim's older son, D.C., how to use on the evening of the shooting. Throughout the evening, the petitioner was drinking vodka. When the boys went to bed, the petitioner was alone in the living room with the victim. He began "talking crazy stuff," and the victim appeared to fear for her safety. The victim was on the couch, and the petitioner picked up his Leatherman knife and said that if he wanted to hurt the victim or her sons, he would have already done so.

From his bedroom, T.W. heard the victim crying in the living room. He went into the kitchen, and he saw the victim lying on the couch and the petitioner standing over her with an envelope opener. He returned to his bedroom and told his brother that he believed that the petitioner stabbed the victim. While in his bedroom, T.W. overheard the petitioner tell the victim twice to sit down.

Back in the living room, the petitioner told the victim to be quiet. He leaned toward her with the knife in his hand. As he leaned forward, the victim raised her hand, and the petitioner cut a finger on her right hand. The petitioner placed his right hand on the couch, and the knife punctured the cushion. Upset that he cut the couch and that the victim was afraid, the petitioner sat down on the couch and took several drinks of vodka. While on the couch, he picked up the pistol and "racked" it. He stood up and walked between the coffee table and the television. The petitioner claimed that he was planning to de-cock the pistol, and he had his finger on the trigger and his thumb on the hammer. His thumb never grasped the top of the hammer, and the gun went off, shooting the victim in the head. The petitioner pulled the victim onto the floor and began repeating her name.

2

D.C. and T.W. heard the gunshot and ran into the living room. D.C. smelled gun powder, and both boys saw the victim lying on the floor. D.C. ran out of the house and called the police, and the petitioner told T.W. to call their neighbor, Russell Riffey.[1] Ms. Griffey, was awakened by her son around 12:30 or 1:00 a.m. on the date of the shooting, before T.W. was able to call their home. Ms. Griffey's son told her that something was wrong at the victim's home and that the victim's sons "were screaming and running in the yard." She received a call from T.W., and she told him to hang up so that she could call 9-1-1. She called 9-1-1, and Mr. Riffey left to go to the victim's home. Ms. Griffey saw Mr. Riffey wrestling with the petitioner on the porch of the victim's home, and she learned from a hysterical T.W. that the victim had been shot in the head. Ms. Griffey went to the victim's home and took T.W. back to her home. Ms. Griffey looked back and saw that police had arrived and that they and her husband were still struggling with the petitioner. Ms. Griffey saw the petitioner being placed in a police car and shouting to tell the victim that he would find employment "and everything would be all right."

The State also said it planned to call Dr. Christopher Lockmuller, a forensic pathologist, who would have testified that at the time of the shooting, the petitioner had to have been within three feet of the victim. Dr. Lockmuller also would have testified consistently with the autopsy report, which showed that the victim had a single gunshot wound to the head associated with severe injury to the brain and skull. There was a "very shallow cut" on the third finger of the victim's left hand, along with five "linear abrasions." Additionally, there were minor abrasions on the victim's body.

At the conclusion of the summary, the trial court asked the petitioner if he contested any of the evidence that the State submitted. The petitioner responded that he contested "[s]ome of it." When asked to specify his objections, the petitioner responded, "On the things that was said on the second statement after I asked for a lawyer, they continued to question me and everything else." Trial counsel clarified for the petitioner that the trial court was asking whether he specifically contested what the State said their proof would be. After a conference with trial counsel, the petitioner stated that he did not contest the evidence. The trial court found the petitioner guilty of second degree murder and imposed a twenty-five-year sentence.

The petitioner filed a timely *pro se* petition for post-conviction relief. The post-conviction court appointed counsel, who filed an amended petition.

---

[1] There is some confusion surrounding the name of the petitioner's neighbor. In their statements to police, both of the victim's sons and the petitioner referred to the neighbor as "Russell Rigby." At the post-conviction hearing, the petitioner identified his neighbor as "Russell Riffey," and this is the name used by other witnesses as well. Because the witnesses at the post-conviction hearing used the last name "Riffey," we will utilize this spelling throughout the opinion.

At a hearing on the petition, the petitioner testified that the weapon that killed the victim contained nine millimeter bullets that Russell Riffey "loaded hot," which meant that the bullets "fire at a higher velocity" and "have extra gunpowder to make them fire hotter and faster." The petitioner told trial counsel about these bullets and asked him to interview Mr. Riffey, but he stated that trial counsel did not do so.

The petitioner testified that he gave several confessions on the evening that he was arrested. He did not write the confessions but made them verbally. The petitioner stated that he recounted his version of events, and the officer wrote it down and read it back to him. The petitioner said he told the officer that he did not say what was repeated to him, and the officer explained that he was conveying the same meaning but using different words. The petitioner testified that the officer "tore up two or three" of his confessions.

The petitioner testified that trial counsel and co-counsel took over his representation after previous counsel had to withdraw from the case due to an excessive case load. The petitioner testified that trial counsel never investigated the crime scene or interviewed the victim's younger son. The petitioner discussed cross-examination strategy with trial counsel, and trial counsel told him that he would not cross-examine the victim's sons.

The petitioner stated that a gun expert, Chris Robinson, worked on the petitioner's case. Mr. Robinson noted that a "blood analysis" should be conducted, along with a test to determine the petitioner's blood alcohol level. Mr. Robinson recommended further examination of the crime scene and a powder test of the petitioner's clothes. The petitioner testified that Mr. Robinson conveyed this information to trial counsel. The petitioner stated that trial counsel did not follow up on these suggestions.

The petitioner testified that he did not have a good relationship with trial counsel. The petitioner felt as though trial counsel often promised to do things, such as interviewing the neighbors and investigating the case, but would not follow through. Trial counsel would sometimes answer the petitioner's questions, but he did not keep in regular contact with the petitioner. The petitioner explained that trial counsel would say that he would return in a few days but would not return for weeks at a time. The petitioner testified that trial counsel did not explain the law to him.

The petitioner felt that he did not have time to consider his plea agreement on the day that he entered it. On the day of the plea, the petitioner informed trial counsel that he was not going to take the plea because he felt as though it would require him to admit that he intentionally killed the victim. Trial counsel presented the petitioner with a blank piece of paper, which the petitioner said that he was not going to sign without talking to

4

his family.  Trial counsel told him, "[T]hat's not gonna happen," and walked away.  The petitioner was taken into a room where he met with his mother and stepfather, and he asked trial counsel for more time to consider the plea.  Trial counsel said that there was no more time, and the petitioner asked if he could fire trial counsel.  Trial counsel replied that the judge would not permit it because "it was too far into it," and he told the petitioner that the plea had to be on the judge's desk before he returned from his chambers.  The petitioner felt that he was coerced into pleading guilty.  He testified that he could not recall if trial counsel informed him that he was waiving his right to an appeal by pleading guilty.

The petitioner recalled having a colloquy with the trial court.  He remembered telling the judge that he did not agree "with everything that was said," and he stated that trial counsel then pulled him aside and told him that he "needed to say 'yes, sir' or 'no, sir,' or I can't remember which one but said that if I didn't say it that the deal would be off the table and I'd be sent back down."  He stated that trial counsel informed him that he would have to tell the judge that he was happy with trial counsel's representation.  The petitioner testified that he answered the question affirmatively but that he actually was not happy with trial counsel's service.

The petitioner testified that he did not agree with all of the stipulated facts read by the State.  He took issue with his second statement to police, believing that the statement would be inadmissible because he had requested an attorney.  The petitioner testified that some of the things in his second statement were untrue.  He stated that he tried to object to the statement but did not do so verbally.  He explained that he began to get "anxious" during the reading of the second statement and that trial counsel was telling him "to calm down."  He testified that he felt like trial counsel prevented him from objecting to the statement.

On cross-examination, the petitioner testified that he only signed one piece of paper from the plea agreement.  The petitioner agreed that he was told that he would be committing perjury if he lied at the guilty plea proceeding.  The petitioner "[v]aguely" remembered the trial court telling him that he was waiving his right to a trial and an appeal, and he agreed that he said "yes" to that question.  He testified that he did not remember answering every question affirmatively because he was informed that if he did not, his plea agreement would be revoked and he would be "sent back downstairs."  The petitioner stated that he wanted to enter a "nolo contendere" plea that day, and he said that he pled guilty out of fear based on what trial counsel had told him.

The petitioner agreed that he had initially received an offer of thirty years from the State and that he authorized trial counsel to make a counteroffer of twenty-five years.  He agreed that he was pleading guilty to the sentence in the counteroffer proposed by trial

5

counsel. He said that trial counsel did not inform him that the State had accepted that offer until the day before he was to plead guilty. He stated that on the date that he was to plead guilty, he changed his mind and needed more time to consider the offer. Trial counsel informed him that if he did not accept the plea, "the deal would be off" and he would be charged with first degree murder. The petitioner agreed that trial counsel explained to him the consequences of rejecting the plea offer, and he stated that trial counsel said that he could not have more time to consider the offer.

The petitioner testified that trial counsel did not discuss discovery with him.

The petitioner testified that if trial counsel had visited the crime scene, he would have learned that there was no history of domestic violence. He stated that if he received more time to consider his plea agreement, he would have obtained a better lawyer who would have investigated the case more thoroughly.

Trial counsel testified that he had been a criminal defense attorney since 1989 and with the Public Defender's Office since 2011. He had tried two murder cases and resolved others through plea bargains. When trial counsel began representing the petitioner, previous counsel had already received discovery, and trial counsel received the discovery file from previous counsel. Trial counsel testified that he "extensively" reviewed the discovery with the petitioner. He said that he examined the petitioner's statements and the victim's children's statements, which he believed would likely "be the most critical part" of the trial. He also reviewed the autopsy report, which indicated that the gun was six inches to two feet away from the victim when it was fired. Trial counsel and the petitioner discussed whether trial counsel should visit the crime scene. Trial counsel explained that the trial was six weeks away and that he did not believe a visit to the crime scene would be beneficial. Trial counsel testified that he had numerous photographs from the crime scene and that "[i]t was pretty conclusive" how far away the gun was from the victim's face when it was fired. Trial counsel stated that he retained Mr. Robinson and that Mr. Robinson stated that the gun barrel was five inches away from the victim's face when it was fired. Trial counsel was present when the petitioner spoke with Mr. Robinson, and he recalled the petitioner's telling Mr. Robinson about the "hot load" bullets. Trial counsel stated that Mr. Robinson did not mention the "hot load" bullets in his report.

Trial counsel testified that he and co-counsel made numerous attempts to contact Mr. Riffey, but Mr. Riffey "had no interest" in speaking with defense counsel. Defense counsel were unable to contact Mr. Riffey via telephone. An investigator was sent to Mr. Riffey's residence, and Mr. Riffey refused to speak with the investigator. Trial counsel testified that with the assistance of the prosecutor, he had made arrangements to interview both of the victim's sons. Trial counsel was able to meet with the older son, but the

younger son declined to meet with defense counsel. Trial counsel testified that the victim's family indicated that the meeting would be too difficult for the son.

Trial counsel testified that the older son "would have been a very devastating witness." The older son indicated that he heard loud voices arguing and then heard the defendant pour a drink, consume it, and slam the glass down. He heard this procedure repeated two or three times. He then briefly heard more loud voices, followed by a gunshot. Trial counsel testified that the older son's version of events "was quite inconsistent with" the petitioner's recollection of the incident. Trial counsel believed the older son would have been a compelling witness, and he began to discuss with the petitioner the need to consider pleading guilty to second degree murder. Trial counsel believed, based on the available proof, that a jury verdict of guilty of second degree murder would have "essentially" been a victory. Trial counsel believed that despite the petitioner's intoxication, there "was a real risk" of the petitioner's being convicted of first degree murder. Trial counsel believed that his conversation with the older son was "the most critical piece" in his investigation.

Trial counsel testified that he "had lengthy discussions" with the petitioner about how to best resolve the case. He "talked at length" about what the State was required to prove to obtain a conviction for first degree murder, and he explained the consequences of a conviction for first degree murder. Trial counsel informed the petitioner that "if the jury followed the law, they probably" should not convict him of first degree murder. Trial counsel was concerned, however, that the jury would disregard the evidence of intoxication and find premeditation due in large part to the older son's testimony.

Trial counsel testified that after the State proposed a thirty-year sentence, he recommended that the petitioner return a counteroffer of twenty-five years. Trial counsel stated that the sentence was similar to the sentence that the petitioner would receive if he was convicted of second degree murder at trial, a result trial counsel said would feel like "a victory." Trial counsel explained that the prosecutor had set a plea deadline of April 2 due to the difficulty of the case and her concern with subjecting the family to protracted plea negotiations. Trial counsel testified that it was "possible" that the prosecutor could have changed her mind and extended the plea deadline, but he did not believe that she would have done so. Trial counsel believed that the petitioner needed to enter a plea on that date or be forced to go to trial.

Trial counsel testified that the petitioner authorized him to make the counteroffer one week before the petitioner pled guilty. Trial counsel spoke with the prosecutor, who informed him that she first needed to meet with the victim's family. After meeting with the family on the Friday before the plea deadline, the prosecutor informed trial counsel that the State would accept the petitioner's counteroffer of a twenty-five-year sentence.

7

That same day, trial counsel informed the petitioner that his counteroffer had been accepted. Trial counsel testified that the petitioner was aware on Friday night that the twenty-five-year offer had been accepted.

Trial counsel testified that the petitioner arrived at the courthouse the following Monday, April 2, and had decided not to plead guilty. Trial counsel asked him if he was sure of his decision because it was the date of the plea deadline. Trial counsel informed the petitioner that he would not receive a better offer and would instead go to trial on the scheduled date. The petitioner reaffirmed that he did not want to plead guilty, and trial counsel went to inform the prosecutor "that the deal was off." The petitioner expressed a desire to speak to his mother, and trial counsel informed him that it was generally not permitted. Trial counsel was able to arrange a meeting between the petitioner and his mother, and trial counsel testified that during this conversation, "it was essentially his mother who talked" the petitioner into accepting the plea agreement.

Trial counsel testified that the petitioner viewed all of the pages of his plea agreement, although he only signed one page. Trial counsel testified that the petitioner had no trouble reading or writing and that he discussed the substance of the plea form with the petitioner. Trial counsel informed the petitioner that the trial court would ask the petitioner if he was satisfied with the services of trial counsel. He explained that the question was "not to make the lawyers feel good, it's just because the Judge doesn't want you coming back six months from now or a year from now and saying my lawyer didn't do his job, so if you want to complain about it, you have to do it today. He's likely not [going to] listen to it a year from now." Trial counsel testified that he told the petitioner that the trial court would not accept his plea if he did not "answer these questions that you are satisfied with you lawyer's services, that you are not under the influence, that you understand what you are doing, and that you're voluntarily pleading guilty."

Trial counsel testified that he pulled the petitioner aside during the plea colloquy to clarify the meaning of the petitioner's "no contest" plea. Trial counsel explained to the petitioner that by answering "no" to the question of whether he contested the statement of facts, the petitioner was not stating that he agreed to it but that he simply was not contesting it. Trial counsel explained that the petitioner needed to respond affirmatively to that question in order to proceed with his plea.

Trial counsel testified that the petitioner expressed his concerns about his statement to the interrogating officer. Trial counsel filed a motion to suppress the statements, and he testified that a hearing would have been held before the petitioner went to trial. Trial counsel testified that the motion was filed on March 30 and that he was prepared to argue it on the date that the petitioner pled guilty. Trial counsel testified that he learned that the prosecutor had talked to several witnesses about prior acts of

domestic violence committed by the petitioner. He filed a motion in limine to exclude this evidence.

Trial counsel testified that Mr. Robinson said that it was possible that there could have been an accidental discharge of a weapon like the murder weapon if the petitioner were attempting "to de-cock the weapon by pulling back on the trigger and then pulling back the hammer." He could not state that this was the manner of discharge in the petitioner's case, but he indicated in his report that it could have happened that way. Mr. Robinson also expressed concern about the lack of alcohol testing on the petitioner the night of the shooting, and he indicated that he did not understand the inconclusive results on the gunshot residue test performed on the victim's younger son. Mr. Robinson believed that the gunshot residue test should have been "conclusive yes, definitely, or no." Mr. Robinson's analysis differed from that of the TBI. Trial counsel testified that it was not contested that the petitioner fired the gun.

Trial counsel believed, after considering all the evidence, that pleading guilty was in the petitioner's best interest, and he discussed this "[a]t length" with the petitioner, who then authorized him to seek a twenty-five-year sentence.

On cross-examination, trial counsel testified that he did not believe that getting the defendant's statements suppressed would have resulted in a more favorable plea offer because the petitioner's "first statement was even more inconsistent than the second statement." Trial counsel explained that the facts as he understood them based upon his investigation were inconsistent with the petitioner's second statement.

Co-counsel testified that she had worked with the Public Defender's Office for seven years. She initially represented the petitioner in general sessions court, and she ceased her involvement in the case when previous counsel was appointed. Co-counsel rejoined the case when trial counsel took over, and she testified that she attended nearly every jail meeting with the petitioner except for possibly the last two. Co-counsel prepared the motion to retain the firearms expert, and she arranged the meeting with the victim's sons, although only the older son arrived for the interview. Co-counsel also obtained Mr. Riffey's phone number and attempted "to contact him many times and could never establish any contact." Co-counsel stated that her investigator also went to Mr. Riffey's home several times and was unable to make contact with him.

Co-counsel testified that the victim's older son "was a very sympathetic witness." Although she believed that some of his statements would be irrelevant at trial, he spoke about prior instances of domestic violence in the home. She agreed with trial counsel's recollection of the testimony indicating that the petitioner was drinking and slamming the glass down. Co-counsel recalled that the older son recounted something that the

petitioner said just prior to the shot that she and trial counsel believed "was fairly devastating." Co-counsel stated that she and trial counsel always discussed everything after meeting with the petitioner, and both agreed that the victim's older son would have been a harmful witness at trial.

The post-conviction court denied the petition. The court found that the decision to pursue a plea agreement was made "after an informed decision" by trial counsel that the petitioner faced a "heightened chance" of being convicted of first degree murder. The court noted that the plea agreement obtained the best result trial counsel believed was possible. The court observed that the offer was conveyed to the petitioner and approved by him at least a week before the plea was entered. The post-conviction court also found that it was not clear how any additional time to consider the plea agreement would have bolstered the petitioner's confidence in pleading guilty

The post-conviction court specifically found that the petitioner's testimony that his plea was coerced was not credible. The court noted that it appeared that trial counsel was describing appropriate courtroom demeanor to the petitioner, rather than instructing him how to answer the trial court's questions. The court reviewed the guilty plea hearing transcript and found that there was no mention of confusion or undue influence. The court found that the petitioner appropriately answered the questions asked of him and that his responses indicated that he understood both the questions and the process of pleading guilty.

The post-conviction court also found that the petitioner had not shown that trial counsel performed deficiently or that the petitioner suffered any prejudice. The court found that there was no evidence that trial counsel had performed ineffectively. The court further found that even if trial counsel had been shown to be deficient, the petitioner had not demonstrated any resulting prejudice. The court found that "the weight of the evidence is strongly against" the finding of any error on the part of defense counsel.

The petitioner filed a timely notice of appeal, and we proceed to consider his claims.

## ANALYSIS

The petitioner argues that his guilty plea was not knowing and voluntary because he was coerced into pleading guilty. He also argues that he should be permitted to withdraw his guilty plea because he did not receive the effective assistance of counsel. Specifically, he contends that trial counsel were ineffective for failing to have a hearing to suppress his written confessions; failing to obtain more time for him to consider the

10

plea agreement; failing to interview Mr. Riffey; failing to investigate the crime scene; and for failing to explain adequately the law or to listen to the petitioner.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2010). The petitioner bears the burden of proving the allegations of fact giving rise to the claim by clear and convincing evidence. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). This court generally defers "to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013). Claims for post-conviction relief premised on ineffective assistance of counsel present mixed questions of law and fact, which this court reviews de novo with no presumption of correctness. *Id.*

## A. Guilty Plea

A guilty plea is constitutional only when it is entered into knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43). In order to determine whether a plea was entered "intelligently" and "knowingly," "'[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Id.* (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). A court must make this determination "based upon the totality of the circumstances." *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1996). A court charged with determining the nature of a guilty plea:

> must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904.

11

The petitioner argues that trial counsel's failure to obtain more time for him to consider the plea agreement coerced him into pleading guilty. The post-conviction court, however, found that the petitioner's testimony on the issue was not credible and that it was unclear how additional time to consider the plea would have affected the petitioner's decision to plead guilty. Further, the court found that transcript of the guilty plea hearing indicated that the petitioner's plea was knowing and voluntary. "A petitioner's testimony at a guilty plea hearing 'constitute[s] a formidable barrier' in any subsequent collateral proceeding because '[s]olemn declarations in open court carry a strong presumption of verity.'" *Bruce S. Rishton v. State*, No. E2010-02050-CCA-R3-PC, 2012 WL 1825704, at *17 (Tenn. Crim. App. May 21, 2012) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)). Trial counsel testified that the petitioner learned the Friday before he was to plead guilty that his offer had been accepted. On the date that the petitioner was to plead guilty, trial counsel accurately informed the petitioner that he had to either enter the plea or proceed to trial because the State had set a plea deadline of April 2 that it would not extend. Trial counsel advised the petitioner that he had the option of pleading guilty or proceeding to trial on the charge of first degree murder, which carried a much lengthier sentence than a conviction for second degree murder, and the petitioner elected to plead guilty. We conclude that the petitioner has not shown that his plea was not knowing and voluntary, and he is not entitled to any relief.

## B. Ineffective Assistance of Counsel

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel. This right affords an individual representation that is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Counsel is ineffective when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must prove that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the petitioner to the degree that the petitioner did not receive a fair trial. *Strickland*, 466 U.S. at 687. A petitioner satisfies the deficiency prong of the test by showing that counsel's representation fell below an objective standard of reasonableness; that is, "the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter*, 523 S.W.2d at 936); *see Strickland*, 466 U.S. at 687. The petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466

U.S. at 687. Courts evaluating the performance of an attorney "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In order to fairly assess counsel's conduct, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Prejudice requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In order to satisfy the prejudice prong in the context of a guilty plea, the petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If the petitioner fails to establish either deficiency or prejudice, post-conviction relief is not appropriate, and this court need not address both components if the petitioner makes an insufficient showing as to one component. *Grindstaff*, 297 S.W.3d at 216 (citing *Goad*, 938 S.W.2d at 370).

Trial counsel testified that he filed a motion to suppress, that the motion would have been litigated prior to trial, and that he did not believe that it would have benefitted the petitioner's case, even if the motion had been granted. Trial counsel testified that the State had set a plea deadline of April 2, and the petitioner's options on that date were to plead guilty or to go to trial. The post-conviction court found that it was unclear how additional time to consider the offer would have affected the petitioner's confidence in his decision to plead guilty. Both trial counsel and co-counsel testified that they made numerous efforts to contact Mr. Riffey and that Mr. Riffey was not responsive to any of these efforts. Co-counsel made phone calls that went unanswered, and Mr. Riffey refused to speak to an investigator who was dispatched to Mr. Riffey's home to speak with him. Trial counsel testified that he discussed with the petitioner whether he should visit the crime scene, and he believed that a visit would not be beneficial because he had numerous photographs of the scene and there was little doubt how far away the gun was from the victim's face when it was fired. Trial counsel also testified that he extensively reviewed with the petitioner the substantial evidence against him, discussed what the State would have to prove to obtain a first degree murder conviction, and explained the significant risk of a conviction the petitioner faced if he were to proceed to trial. We agree with the post-conviction court that the petitioner has not met his burden of showing that trial counsel was ineffective, and he is not entitled to any relief.

**CONCLUSION**

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE